Northrop *v.* Sumney.

[GENESEE GENERAL TERM, May 17, 1858. *Grover, Marvin* and *Davis*, Justices.]

---

NORTHROP *vs.* SUMNEY.

When a grantor bounds the land which he conveys, by the land of another person, he does not undertake that the visible division fence is upon the true line, but he leaves the true line to be ascertained.

Where both parties to a deed acted under a mistake in respect to the quantity of land embraced in the boundaries, in consequence of their supposing that the fences on the north and south sides stood upon the lines of the lot, and that there were 67 acres between those fences, whereas the south fence stood upon the land of one H., 4 chains and 87 links from the true line, and the quantity of land embraced in the description was but 39¾ acres, instead of 67 acres; *Held*, in the absence of any fraud or misrepresentation, that the grantee was without remedy; and that the deficiency in quantity constituted no defense to an action brought against him to foreclose a mortgage given for the purchase money.

Where a deed described the land conveyed as bounded " on the south by land heretofore deeded to C. H."; *Held*, that the southern boundary being susceptible of being ascertained and located with certainty, the more uncertain and doubtful portions of the description—such as distance and quantity—must yield to it, if not capable of being reconciled with it.

APPEAL from a judgment entered upon the report and decision of a referee. The action was brought to foreclose a mortgage executed by the defendant to Alexander R. Shaw. The plaintiff was the assignee of the mortgage. The referee found that the Holland Land Company was seised of lot No. 98, and that on the 27th of May, 1834, the company conveyed in fee to one Clark Hilton a portion of the lot bounded east and west by the lines of the lot, and *north* by a line parallel with the south line of said lot, and 34 chains and 2 links northerly therefrom. On the 10th of April, 1838, the company conveyed to the Farmers' Loan and Trust Company a portion of the lot, bounded north by a line parallel to the north bounds of said lot, at the distance of 9 chains south therefrom 55 chains and 92 links; east by township No. 12 &c. 12 chains and 10 links; *south by land heretofore deeded to Clark Hilton* 55 chains and 92 links; west by lot No. 92, 11 chains and 94 links, containing 67 acres of land, be the same more or less. The Farmers' Loan and Trust Company conveyed, by the same description, to one Brink; and Brink conveyed to Beebe, who, on the 10th of January, 1843, conveyed to Shaw by the same description; and Shaw on the 5th of November, 1849, conveyed by deed containing covenants of seisin and warranty, to the defendant, by the same description. The defendant executed to Shaw his bond and the mortgage in question, containing the same description, to secure a portion of the purchase money. Shaw sold, and the defendant purchased, the land in gross. No survey or measurement was contemplated by either party. The purchase money to be paid was $1876, and this amount was ascertained by estimating the land at 67 acres, at $28 an acre. The defendant entered into possession immediately. By a survey afterwards made, it was established that the north line of the lot (98) was, on the east line of the lot, only 16 chains and 23 links, and on the west line 16 chains and 7 links north of the land conveyed to Clark Hilton.

At the time Shaw conveyed to the defendant, and for a

great many years previous, there was a fence extending across the lot from east to west, parallel with the north line of the lot, and 9 chains south therefrom; and also a fence across the lot east and west, starting at a point in the east line of the lot, 21 chains and 10 links south of the north line of the lot, and reaching the west line of the lot 20 chains and 94 links south of said north line. The quantity of land between these fences and the east and west lines of the lot, was 67 acres. At the time Shaw sold and conveyed to the defendant, both parties believed that the said fences marked the north and south lines of the land conveyed, and that the quantity was 67 acres. In 1851, the heirs of Clark Hilton recovered, in an action of ejectment against this defendant, the strip of land north of the above mentioned south fence, extending across the lot, containing $27\frac{1}{4}$ acres. Shaw had notice of the action, and was required to defend it.

The referee decided, as conclusions of law, that the plaintiff was entitled to the usual judgment of foreclosure, and that the facts did not constitute any defense; that the defendant was not entitled to any deduction from the amount secured by the bond and mortgage, by reason of the deficiency in the quantity of the land. The defendant took several exceptions. The pleadings raised all the issues passed upon. Judgment was entered pursuant to the decision of the referee, and the defendant appealed to the general term.

*A. Sawin,* for the appellant.

*L. Farrar,* for the respondent.

*By the Court,* MARVIN, J. The defendant supposed he was purchasing a certain piece of land containing 67 acres, and his grantor supposed he was selling and conveying such piece. It turns out that the piece of land as described in the deed does not contain all the land the parties supposed it contained, and that the quantity actually conveyed is only $39\frac{3}{4}$ acres; instead of 67 acres. There is no question of

fraud or misrepresentation, in the case. Both parties acted in good faith. They were both under a mistake as to the place where *the deed* fixed the southern line. Has the defendant any remedy ? Can he have any relief?

The point is made, and argued, that the description in the deed from Shaw to the defendant included the land to the south fence, and that as the defendant had been ejected from 27¼ acres of the land, the covenants of his grantor have been broken, and the defendant may recover his damages, and may, therefore, now have them abated from the bond and mortgage. This position cannot be sustained. The southern boundary, as described in the deed from Shaw to the defendant, is "by land heretofore deeded to Clark Hilton." The north line of the land conveyed to Hilton, was susceptible of certain ascertainment, and it was the south line of the land conveyed to the defendant, as described in the deed. Distance and quantity must yield to this line, which could be located with certainty. In a case not reported, the court of appeals held that a line described as parallel with the line of the lot, must be so located, though such location would violate the description as to course and distance. But it is unnecessary to refer to this case in the court of appeals. By all the well settled general rules of construction, relating to descriptions in deeds, the land conveyed extended no further south than to the land previously conveyed to Hilton. The least certain and material parts of the description must yield to those which are the most certain and material, if they cannot be reconciled. (4 *Kent's Com.* 466.) In this case the lengths of the east and west lines, and the estimated quantity of land, must give way to the certain southern boundary. There has been no breach of any of the covenants in the deed from Shaw to the defendant.

The defendant's counsel also insists that the defendant is entitled to relief, on the ground of a *mistake of fact*. That both of the parties to the deed were under a mistake as to an important fact, is not denied. The referee so finds. What

was the character of this mistake ? It was simply as to where the southern line of the land conveyed was, upon the ground. They supposed and believed the south fence to be that line, when, in truth, the line as *described* in the deed, was 4 chains 87 links further north.

The defendant has all the land described by the boundaries in his deed. He has not the strip of land 4 chains 87 links wide, across the lot, containing 27¼ acres, which he supposed and believed was included, by the description in his deed. The case is to be examined in the absence of fraud, and in the absence of any representations of any kind, unless we are to understand, from the fact that the fences had been long standing, and from the finding of the referee, that both parties believed that the fences marked the north and south lines of the land conveyed; that the parties went upon the land; and that the fences were pointed out by Shaw as indicating the north and south lines of the land conveyed.

In regard to mistakes of fact, Story says the general rule is, that an act done, or contract made, under a mistake, or ignorance of a material fact, is voidable and relievable in equity. (1 *Story's Eq.* 140.) There must not be any culpable negligence. The fact must be material to the act or contract, and essential to its character and an efficient cause of its concoction. (§ 141.) It is not necessary that there should be any presumption of fraud, in cases of mutual mistake, going to the essence of the contract. (*Id.* § 142.) The cases cited, are where the thing in relation to which the contract was made did not exist, or had ceased to exist, when the contract was made, both parties being ignorant of the fact. In the case before us, the land described in the deed existed, and the defendant has it.

In *Dale* v. *Roosevelt*, (5 *John. Ch. R.* 174 ; *S. C. in court of errors*, 2 *Cowen*, 129,) cited by the defendant's counsel, Robert Fulton had purchased a tract of land of Roosevelt, upon the Ohio river, in Indiana, upon the representations of Roosevelt that there was a valuable coal mine on the land on

Northrop *v.* Sumney.

the bank of the river. Fulton purchased the land, and also entered into an agreement to pay Roosevelt $1000 yearly, depending upon certain terms relating to the coal. An action was brought upon this agreement, by Roosevelt, against the representatives of Fulton, and the latter filed the bill to restrain the action at law, and for relief against the agreement. The chancellor found that there was no coal mine, in fact, within the boundaries of the land conveyed, and that the contract on the part of Fulton was founded in mistake and misrepresentation, and Roosevelt was perpetually enjoined from prosecuting the action to recover the annuity. The chancellor stated the question to be whether the contract was not founded upon representations made by the defendant to Fulton, which were not true in point of fact, and he found that the representations made to Fulton were altogether fallacious, and the consideration for the stipulation of the annuity did not exist, in point of fact. The decree of the chancellor was affirmed in the court for the correction of errors, where Woodworth, J., stated the question to be, whether the contract respecting the annuity was entered into on the part of Fulton in consequence of representations which were either fraudulent or untrue, in point of fact, and founded on mistake. He laid down the principle that it was enough that Fulton put confidence in the statement made by Roosevelt, and relying on its truth, consented to be bound.

In *Champlin* v. *Laytin,* (6 *Paige,* 189,) the executors and trustees of Mrs. De Peyster's estate, in the upper part of New York, made a map, in 1821, laying the land out into lots, with a view to sale, and on the map delineated a street. In 1822 they sold lots with express reference to the map. They sold and conveyed a lot "bounded north-easterly by Fifth street," the street delineated on the map. In 1828 the executors and trustees sold, to the defendant Laytin, two lots, lying wholly in Fifth street, as it had been mapped. He paid a portion of the purchase money, and gave bonds and mortgages for the remainder. The deeds, each, contained a cov-

enant that the executors "had not done, committed or suffered any act, matter or thing whatsoever, whereby to charge or incumber the premises thereby granted, or any part thereof, in title, estate or otherwise." Laytin, before completing the purchase, was apprised of all the material facts, except the fact that the executors and trustees had sold and conveyed lots bounded by Fifth street as projected on the map. This fact was not communicated to Laytin, nor did he know the fact. It was understood that the city could take the land for a street, but one of the executors, to induce Laytin to complete his purchases, stated to him that if Fifth street was opened the lots would be paid for to their full value. He represented that the title was perfect, and free from all incumbrance. The city subsequently opened the street, and Laytin was only awarded nominal damages, on the ground that the executors and trustees had dedicated the land for a street, by conveying lots bounded upon it. Laytin was relieved by the decree; the vice chancellor putting his decision mainly upon the ground of a mutual mistake of the law. The chancellor affirmed the decree, without sanctioning the position of the vice chancellor as to a mistake of law. This decree was affirmed in the court for the correction of errors, (18 *Wend.* 407,) upon the ground that Laytin made the purchase and accepted the conveyances, and gave his bonds and mortgages, under a mistake or ignorance of facts. He did not know of the deed to Wetmore, bounding a lot upon Fifth street. Justice Bronson says, he trusted to representations which he had a right to understand as relating to the facts of the case, and which, though innocently made, have turned out to be false and deceptive.

Again: the fact that they had sold lots in reference to the proposed street, was in the highest degree important to the respondent. He had a right to that information, that he might judge for himself, or consult counsel in relation to the legal consequences of such an act. Further on, the judge says: "This, then, is a case where the parties have bar-

gained under a mutual mistake, going to the essence of the contract. The error of the appellant was one of law, but the mistake of the party seeking relief was a matter of fact. He had no knowledge of an act done by the other, which had destroyed the whole value of the property. He purchased under a misrepresentation, which, however innocently made, operated as a fraud upon him. It is against conscience for those who led him into the error to insist upon the fruits of the contract."

In *Belknap* v. *Sealey*, (2 *Duer*, 570,) the plaintiff brought his action to rescind an executory contract for the purchase of land in Brooklyn. The defendant supposed the quantity of land to be 8 acres and 154 perches, and so represented to the plaintiff, who entered into the contract to purchase at $14,000, paying at the time $1000. The real quantity was short of 5 acres. The judge trying the cause found that the quantity of the land formed an essential inducement to the plaintiff to purchase, and that the actual quantity was substantially and essentially less than the quantity which the plaintiff supposed he was purchasing; and so the plaintiff was misled as to the quantity he purchased, the representations made to him by the defendant being in fact untrue, though not intentionally false. The plaintiff was relieved from the contract; and, upon appeal to the general term of the superior court, the judgment was affirmed; and so also in the court of appeals. Justices Emmet and Bosworth delivered opinions for affirmance, and both notice the fact that the contract was still executory. Bosworth says "it was proved that the agreement was procured by a misrepresentation of material facts, forming an essential inducement to the contract. It is a case of mutual mistake, induced by untrue representations of the defendant. If they were not innocently made by him, he committed an actual fraud. But though made innocently, equity will not permit the defendant to hold the plaintiff to a contract which he has by such means induced him to enter into, when the thing contracted for is so

essentially different from what it was represented, and by reason of such representation was believed, to be."

In *Voorhees* v. *De Meyer*, (2 *Barb. S. C. R.* 37,) the defendant entered into a contract with the assignee of the plaintiff, to sell to him "lots No. 9 and 11, in No. 20 in great lot No. 34, 187½ acres, for $750." Under an act of the legislature of 1790, commissioners surveyed and divided great lot No. 20 into smaller lots and marked the boundaries. In 1811, or 1812, one Cockburn subdivided lot 34, one of the subdivisions of great lot No. 20, and produced said lots 9 and 10, and, according to his survey, these lots contained, No. 9, 45½ acres, and No. 11, 142½ acres. It appeared from the evidence, and the court so found, that Cockburn's survey of lot 11 extended north of the north line of lot 34, which he subdivided, and included 43½ acres of lot 35. The defendant had no title to any portion of lot 35, or to this 43½ acres. The parties contracted in reference to the Cockburn survey, the defendant intending to sell the lot as laid out and marked by Cockburn, and the purchaser supposed he was buying the lot so marked, which actually contained the quantity of 142½ acres. The action was brought by the assignee of the purchaser, to compel the vendor to perform his contract of sale, and as he could not make a good title to the 43½ acres, which it was found, as a matter of fact, he had contracted to sell, he was decreed to perform the contract as far as he could, and damages were allowed for the deficiency of land. The case, when understood, is simply the ordinary case where a vendor cannot make to the vendee a good title to all the land he has agreed to sell, and the vendee is willing to take that portion to which a good title can be given, and compensation in damages for the portion to which the vendor cannot make title. The case has no application to the one we are considering.

I have referred thus fully to the cases mainly relied upon by the defendant's counsel, for the purpose of ascertaining with precision, the facts and the reasons upon which the de-

Northrop *v.* Sumney.

cisions proceeded. They are all unlike, and as I think, in principle, unlike the present case. In all of them, strong representations were made by the vendor, which, though not held fraudulent, were untrue, and were strong inducements to the purchaser. In *Rosevelt* v. *Dale*, (2 *Cowen*, 129,) no coal mine of any value existed, and there was an entire failure of consideration for the agreement to pay the annuity. This agreement was executory. In *Champlin* v. *Laytin*, (18 *Wend.* 409,) a fact, of the most decisive importance was known to the vendors; it was not communicated to the vendee, though there was no fraudulent concealment, as the vendors did not, in the view they took of the law, suppose it important. Other facts were known or communicated to the purchaser, and he was strongly assured, by the vendors, that all was right. He was entirely ignorant of the fact which, when properly understood and applied, deprived him of his entire purchase. In *Belknap* v. *Sealey*, the contract was still executory. " The agreement was procured by a misrepresentation of material matters, forming an essential inducement to the contract." It was a case of mutual mistake, induced by untrue representations of the defendant.

In the present case it does not appear that any representations of any kind were made by Shaw, the defendant's grantor. All that appears is, that there were fences which the parties supposed to be upon the south and north lines of the farm; that there were 67 acres between these fences. Neither party was aware of the fact that the south fence was upon the land of Hilton's heirs, and 4 chains 87 links from the true line. The simple truth is, that the Holland Land Company, in conveying to the Farmers' Loan and Trust Company, in 1838, made the mistake, in giving for the eastern boundary 12 chains 10 links, instead of 7 chains 23 links, and for the west boundary 11 chains 94 links, instead of 7 chains 7 links. Possession had been taken, many years before the conveyance by Shaw to the defendant, according to the description in the deed from the Holland Land Company,

and all the subsequent deeds followed the description in the deed from the Holland company. The case comes to this : the land in question belonged to Hilton's heirs. The fence had not been built upon the true line. The parties—Shaw and the defendant—supposed it had been. Shaw sold and conveyed to the defendant; they both supposing the land conveyed extended to the fence, but in the deed the south boundary is " by land heretofore deeded to Clark Hilton." The defendant accepted this deed. He did not require Shaw to specify the *fence* as the southern boundary. And Shaw only undertook to convey the land as bounded south by Hilton's land.

I have come to the conclusion, with some hesitation, that the defendant is remediless. It is a case where the fence between adjoining owners has not been put upon the true line. While it thus stands, one of the owners conveys his farm, giving as a boundary the line of his neighbor's land. The question, in the absence of adverse possession, &c. remains open for a reconstruction of the fence upon the true line. Such cases are constantly arising, (not when the error is as great as in the present case,) and I am not aware that any action has ever been instituted by a purchaser against his grantor, on the ground of a mistake as to the true line, though both parties saw the actual division fence and supposed it was properly placed upon the line. To permit an action in such a case would, I apprehend, be a source of much litigation, and would be extremely dangerous. The grantor, when he bounds the land which he conveys, by the land of another, does not undertake that the visible division fence is upon the true line, but he leaves the true line to be ascertained. The grantee can always protect himself by requiring a different description, as making the fence the boundary, or leaving it solely to courses and distances. In my opinion the judgment should be affirmed.

[Genesee General Term, May 17, 1858. *Grover, Marvin* and *Davis,* Justices.]