Edwin G. Evans and Others, Plaintiffs, *v.* Charles F. Lux, Defendant.

Supreme Court, Wayne County, September, 1923.

Ejectment — when descriptive boundaries in deed control — adverse possession — deed need not convey valid title in order to sustain claim of title by adverse possession founded on a written instrument — when harvesting of hay and flag constitute cultivation — Civil Practice Act, § 38 — judgment for defendant.

Both of the parties to this action in ejectment, involving a part of lot 67 in the Montezuma marsh in Wayne county, traced their title to one H., who formerly owned the whole of said lot, except about forty acres which had been set off to one B., the south line of whose land was a continuation easterly to the Seneca river, of the south line of hard land which later was owned by one V. Upon the trial it appeared that in 1865 H. conveyed a part of the lot to one S. by a deed in which the land conveyed was bounded and described as follows: " On the east by the Seneca river; on the south and west by lines of said lot No. 67; on the north by the south edge of an upland ridge running across said lot No. 67, and containing about one hundred acres." Crusoe creek, which marks the southern boundary of the lands described in defendant's deed and which he claims marked the northern boundary of those intended to be conveyed to S., runs from east to west across lot No. 67 and the only known piece of upland upon said lot begins considerably north of said creek and was at one time owned by V. By various mesne conveyances in some of which the descriptions vary, but all and every of which sufficiently identifies the land to be the same as in the deed to S., the title thereto became vested in one E., the testator of plaintiff, in 1916. *Held,* that the descriptive boundaries if in conflict with the amount of land specified in the deed to S., must control and in the absence of proof the existence of any other hard land or " upland ridge " than that of V. would not be assumed.

There was a conclusive presumption that the grantor intended by the deed to S. to convey all the land in lot No. 67 extending from its west line to the river and lying south of the line of the upland ridge which marked the land later owned by V.

The description in said deed to S. including in fact more than two hundred acres, the claim of defendant that the grantor intended to convey one hundred acres out of the southeast corner of said lot, then commonly called the state's acres, was without foundation.

But it was, however, established that for thirty-two years immediately prior to the commencement of the action the defendant and one L., his immediate predecessor, have claimed title to and ownership of the land in dispute on the strength of a deed from V. in 1887, founded originally on one from H. to one J. executed in 1874; that such claim was openly made and known to all interested parties and that yearly during all that time the flag and marsh hay, the only crops the land could produce, were harvested and used either personally or for sale by L., his agent, his employees and his successor. *Held,* that such use of the land constituted usual cultivation within the meaning of section 38 of the Civil Practice Act and that defendant's claim of ownership from adverse possession must be sustained.

In order to sustain a claim of title by adverse possession founded upon a written instrument it is not required that the deed be sufficient to convey a valid title

ACTION in ejectment.

*A. J. & F. A. Parker*, for plaintiff.

*Alfred S. Armstrong* (*Charles P. Williams*, of counsel), for defendant.

SAWYER, J. The parties to this action both trace their title from one William Penn Howland, who formerly owned all of lot 67 in the military tract except thirty-nine and one-quarter acres which had been set off to Loami Beadle. The property in dispute is a part of that lot and, his ownership being admitted, it is presumed that Mr. Howland's title traced back to the sovereign, so that the question of actual possession by plaintiff or his later predecessors is not necessarily involved; the facts create a constructive possession sufficient for plaintiff's *prima facie* case. *Baker* v. *Duff*, 136 App. Div. 13; affd., 202 N. Y. 570; *Greenleaf* v. *B., F. & C. I. R. Co.*, 141 id. 395, 398; *Wiechers* v. *McCormick*, 122 App. Div. 860, 865.

On March 22, 1865, Mr. Howland and his wife sold and conveyed the lands in dispute to Henry C. Spaulding and by various mesne conveyances, in some of which the descriptions vary, but all and every of which sufficiently identifies the land to be the same as in the Spaulding deed, title thereto apparently became vested in David H. Evans, the testator of plaintiff and the original plaintiff herein, upon the 21st day of February, 1916.

The Spaulding deed described the land as being all that piece or parcel of land situate in the town of Savannah in the county of Wayne and state of New York, being part of lot No. 67 of said town of Savannah and bounded as follows: " on the east by the Seneca River; on the south and west by the lines of said lot No. 67; on the north by the south edge of an upland ridge running across said lot No. 67, and containing about one hundred acres."

This description includes, in fact, more than 200 acres and the defendant argues that the deed was really intended to convey 100 acres out of the southeast corner of lot 67 which was then commonly called the state's 100 acres. For this claim I can find no foundation. Mr. Howland owned all of the lot save only Mrs. Beadle's $39\frac{1}{4}$ acres, the south line of which was a continuation, easterly to the Seneca river, of the south line of hard land which was later owned by Andrus Vorce. The grantor is conclusively presumed to have intended to convey the lands as they were bounded, for the lot lines, the river and the upland ridge, are objects natural and artificial by the deed itself made to constitute their boundaries. If these descriptive boundaries conflict with

the amount of land specified they must control. Gerard Titles (5th ed.), 542; *Jackson* v. *Defendorf,* 1 Caines, 493; *Wendell* v. *Jackson,* 8 Wend. 183; *Northrop* v. *Sumney,* 27 Barb. 196; *Jones* v. *Holstein,* 47 id. 311; *Masten* v. *Olcott,* 101 N. Y. 152.

Lot 67 is a part of what is known as the Montezuma marsh, and the lands in dispute, being low and wet, are not susceptible of cultivation in the ordinary and usual sense of the word as applied to land. Their only vegetation consists of flags and marsh hay and, with thousands of other acres of similar land, they have remained from the beginning without buildings as well as unmarked and uninclosed by fences. From east to west across the lot there runs a creek, known as Crusoe creek, which marks the southern boundary of the lands described in defendant's deed and which he claims mark the northern boundary of those intended to be conveyed by the Spaulding deed referred to. It is true that, if the creek constitutes its northern boundary, the land conveyed by that deed would more nearly equal 100 acres than it would if the Vorce hard land is that therein described as "an upland ridge." If Howland and Spaulding had, however, so intended it seems entirely improbable that a natural boundary like the creek would have been overlooked by them. They would not have instead chosen for descriptive purposes another natural object of which there was no example within many rods of the creek. The only piece of upland upon lot 67, of which we have any knowledge, begins considerably north of Crusoe creek and was at one time owned by Andrus Vorce. The map contained in the atlas of Wayne county, which was introduced in evidence by defendant, clearly shows that, with the exception of one piece of land projecting into it from the west at about its center and north of the creek and extending easterly nearly to the river, lot 67 consists entirely of marsh land, and in the testimony of all the witnesses, many of whom have been familiar with the property for years, this piece of hard land, lying to the north of Crusoe creek, is the only piece of hard land mentioned as being in that vicinity and is described by nearly all of them as being the farm of Mr. Vorce. Defendant suggests that there may have been at some time other hard land to the south which was that described in the Spaulding deed, but such does not seem to be possible. If there had been any other ridge to the south, it would still be there. It is not probable that it would have disappeared into the marsh or in any way have been removed, or that in the event of so unlikely a happening some note and comment thereon would not have been made and crept into these proceedings. In the absence of evidence we cannot assume the existence of any other hard

land or " upland ridge " than this of Mr. Vorce. *Trustees of East Hampton* v. *Kirk*, 68 N. Y. 459, 464.

Many of the deeds in evidence show carelessness of description, doubtless due to the fact that until quite recently the lands were deemed to be of little value, and the estimate of the amount of land contained within the boundaries of the Spaulding deed is only one example of such lack of care; nevertheless, I am persuaded that the deed conveyed and was intended to convey all the land in lot 67 extending from its west line to the river and lying south of the line of the upland ridge which marked the farm later owned by Andrus Vorce and that by his deed from George S. Covert and wife, dated February 21, 1916, plaintiff's testator obtained a perfect record title thereto.

January 16, 1874, by a quitclaim deed, William Penn Howland released and attempted to convey to William Jones all of great lot No. 67 with the exception of Mrs. Beadle's 39¼ acres and the state's 100 acres in the southeast corner, and by various mesne conveyances the property in it described apparently vested in one Gideon Ramsdell upon January 31, 1883, by deed·from Alice Gray Howland. At the time the Jones deed was given Gideon Ramsdell held a mortgage against all that part of lot 67 lying north of Mrs. Beadle's north line and its extension to the west line of the lot and by a foreclosure of that mortgage Mr. Ramsdell had obtained a referee's deed of that property on May 22, 1880. The land to the south of the upland ridge spoken of had been, more than nine years before the deed to Jones, sold and conveyed to Mr. Spaulding and was then owned by his grantee, the Seneca and Cayuga Marsh Company. From these facts it will be at once seen that while the deed from Alice Gray Howland to Mr. Ramsdell conveyed and confirmed in him all the land described in the mortgage together with other land between it and the south edge of the upland ridge, it was an entire nullity as to any land south of that ridge.

In the meantime and on January 20, 1883, Mr. Ramsdell procured three quitclaim deeds to all of lot 67, other than the 39¼ acres, which deeds described the lot as containing 300 acres, instead of 600 acres and 640 acres as it has been variously said to contain by other of the deeds spoken of. Just who the grantors of these three quitclaim deeds were is not clear but I assume them to have been heirs of William Penn Howland. Whoever they may have been, their deeds, as well as that of Alice Gray Howland, were ineffectual to vest title in Mr. Ramsdell to that part of lot 67 which had been theretofore conveyed to Mr. Spaulding. That Mr. Ramsdell fully understood he had no title to the part of lot

67 lying south of the upland ridge seems certain, for when he later sold 100 acres to Mr. Vorce, which included the hard land spoken of, and which he unquestionably owned, he gave, as he properly should have done, a warranty deed thereof and then, seven days later, released to Mr. Vorce, by a quitclaim deed, that portion of the marsh lands lying south of the hard lands and north of Crusoe creek. Just why Mr. Ramsdell attempted to convey these low lands to Mr. Vorce cannot now be known but it remains that nothing passed under the deed. Later and upon August 16, 1887, Mr. Vorce quitclaimed the lands to Charles A. Lux, from whom, by a trustee in bankruptcy, they were later deeded to this defendant.

From the foregoing recital it will be seen that defendant's record title from William Penn Howland is based upon the deed to William Jones which was wholly without effect as a conveyance of the lands in question. It is said, however, by defendant that any defect in his title from the original grantor Howland has, as to the greater part of the land in controversy, been cured by a land patent from the state of New York to Charles A. Lux under date of February 8, 1909; it will, of course, be admitted that a deed from the state of New York of lands *owned by the state of New York* carries with it the absolute and indefeasible title thereto. The patent in question is in form only a release and quitclaim of the state's interest in that part of the lands therein mentioned and contains the very significant statement that it " shall in no wise operate as a warranty title."

I take it that even the sovereign state cannot convey that which it does not own. It will not be seriously argued that the state can take without compensation lands of one person and convey them unto another; or that, if it should inadvertently attempt to do so, its grantees would obtain title thereto.

The facts underlying this transaction are briefly: Under the provisions of the Barge Canal Act (Laws of 1903, chap. 147, § 4) the state in or about the month of December, 1904, made and served upon Mr. Charles A. Lux, as owner, an appropriation map of all of the premises in question except a triangular piece in the northerly part, the apex of which triangle lay just easterly of the northwest corner and its base upon the Seneca river. Later the plans for that canal were changed and the lands so appropriated being no longer required were formally abandoned by the state at a meeting of the canal board held upon April 28, 1908.

In the meantime a claim for the value of the lands had been filed by Mr. Lux against the state upon the theory that he was the owner thereof. After their abandonment an adjustment of the claim was made between Mr. Lux and the state wherein he agreed to accept a reconveyance from the state, together with a sum of

money, in full settlement for all claims which he might have by reason of such appropriation, including the temporary use of the lands by the state, and it was in pursuance of this agreement that the patent deed was issued and delivered to him.

Under the Barge Canal Act, as well as under all the canal acts which had preceded it, the state might at will appropriate and acquire the title for any land it deemed needful for canal purposes. The act, as well as the one in force for many years before, provided that it might enter upon, take possession of and use the lands at will, but before its appropriation should be deemed complete a notice of the filing of the appropriation map, together with a description of the property appropriated, must be served upon the owner of the property if within the state of New York; if not, such notice must be served by filing it in the office of the clerk of the county wherein the property was situated. At the time the state entered and took possession of these lands two deeds therefor were outstanding, one in the name of Charles A. Lux as grantee, which was founded upon the deed from William Penn Howland to William Jones and the other in the name of Hutchings E. Newton as grantee, which was based upon that from William Penn Howland to Henry C. Spaulding; notwithstanding the fact that both these deeds came from a common source and that the one held by Mr. Lux was inferior to that of Mr. Newton in point of time and date of record, the state authorities treated him as the true owner and later, as a preliminary to the issuing of the patent deed spoken of, the attorney-general's office certified that he had a good and marketable title in fee simple to the land so appropriated. Acting upon this theory of title and ownership the notice in question was served upon Mr. Lux instead of upon Mr. Newton who was in fact the true record owner.

The state may enter upon and use such lands as it needs at will, the formal appropriation and notice being intended, as I view it, to serve as proof of the exact amount of land which it intends to take as well as to afford unmistakable evidence enabling the owner to establish his claim for compensation. But for the statute no notice whatever would need to be served if the owner be given opportunity for a full hearing of the question of compensation. *Gring* v. *Am. P. & C. Co.*, 132 N. Y. Supp. 545. So far as the actual passing of title to needed property to the state is concerned, it is not had by either the taking, the use, the filing of the appropriation map or the service of notice of such filing upon the property owner, and in the instant case was unaffected by either the service upon Mr. Lux or the failure to serve upon Mr. Newton. *Waller* v. *State,* 144 N. Y. 579, 599.

Not only is it the fundamental law of our state that property

cannot be taken for public purposes without due compensation, but it seems to be the settled law, at least so far as canal lands are concerned, that the actual title to land appropriated for such use does not pass to the state until compensation shall have been fixed and paid. *Baker* v. *Johnson,* 2 Hill, 342; *Turrell* v. *Norman,* 19 Barb. 263; *Waterloo Woolen Mfg. Co.* v. *Shanahan,* 128 N. Y. 345, 363.

As has been seen, the state after taking possession of these lands not only failed to complete the transaction and acquire their title but abandoned them entirely. The adjustment between the state and Mr. Lux and the delivery to him in furtherance thereof of a quitclaim of any interest which the state derived under its appropriation was not a payment for the land but for its use theretofore had by the state and a release from further claim.

My conclusion upon the whole matter is that the state gave to Mr. Lux no better right to these lands than he already had and by its patent vested no ownership thereof in him.

In addition to this claim of written title defendant pleads his right as against this plaintiff to retain the premises for the reason that he has had possession of them for more than twenty years under a claim of title exclusive of any other right, during all of which time the premises have been usually cultivated and improved by him and those under whom he claims.

At the outset it may be said that after he took his deed in 1885 Mr. Newton, one of plaintiff's predecessors in title, for two or three years cut more or less of the marsh grass growing on the lands. Just when this was done does not appear but it must have been prior to August, 1901, for Mr. Newton's will was probated by the surrogate of the county of Wayne upon the twenty-eighth day of that month. This was reported to Mr. Lux, who through his agent, ordered him to cease, after which, so far as appears, no further effort was made by him to exercise dominion over or upon the lands, except as his claim of ownership may appear from taxes paid by himself and his successors in interest, and may be said to include lands north of Crusoe creek as well as to the south of it.

Gideon Ramsdell deeded to Andrus Vorce in March, 1883, and Vorce in turn to Charles A. Lux in August, 1887. At some time after the deed from Ramsdell, but whether before the deed to Mr. Lux is not shown, Mr. Vorce plowed and cultivated ten or twelve acres of this marsh land and from the beginning harvested as much of the marsh hay as he desired. His grantee, Mr. Charles A. Lux, was a large dealer in flag and every year following his deed and, if the evidence is to be believed, this includes the time while it was in the possession of the state and for which the state paid him, harvested and sold the flag which it produced; the crop in many

years running into thousands of bundles. This business has been continued by his grantee, the present defendant, continuously down to the time of the trial of this action. From the sale to Mr. Lux in 1887 to his death a few years ago Mr. Vorce, who resided on the hard land he had retained, looked after this marsh at the request of Mr. Lux and paid the taxes assessed against it, and in consideration thereof was allowed by Mr. Lux to cut for himself yearly the marsh hay that grew thereon.

Section 370 of the Code of Civil Procedure (now section 38 of the Civil Practice Act) provides that

" For the purpose of constituting an adverse possession, by a person claiming a title, founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in either of the following cases:

" 1. Where it has been usually cultivated or improved.

" 2. Where it has been protected by a substantial enclosure.

" 3. Where, although not inclosed, it has been used for the supply of fuel, or of fencing timber, either for the purposes of husbandry, or for the ordinary use of the occupant."

In order to sustain a claim of title by adverse possession founded on a written instrument, it is not required that the deed be sufficient to convey a valid title. *Miller* v. *Long Island R. R. Co.*, 71 N. Y. 380, 384; *Ramapo Mfg. Co.* v. *Mapes*, 216 id. 362, 370. For thirty-two years immediately prior to the beginning of this action defendant and his immediate predecessor, Charles A. Lux, have claimed the title to and ownership of the land in dispute on the strength of the deed from Vorce founded originally on the deed from Howland to Jones. That claim was openly made and known to the neighbors and others interested including the state authorities and plaintiff's predecessor within twenty years, Mr. Newton. After being ordered off, the latter, as well as every one else, accepted that situation and acted accordingly. ·Yearly during all that time the flag and the marsh hay which were the only crops the land could produce were harvested and used either personally or for sale by Mr. Lux, his agent, his employes and his successor. That was the only use for purposes of husbandry of which the land was susceptible and apparently its only use for any purpose. It constituted usual cultivation within the meaning of the statute and defendant's claim of ownership from adverse possession must be sustained. *Shinnecock Hills & Peconic Bay Realty Co.* v. *Aldrich*, 132 App. Div. 118; *Koch* v. *Ellwood*, 138 id. 584; *Ramapo Mfg. Co.* v. *Mapes, supra.*

Judgment is directed for defendant, with costs. Findings may be submitted.

Judgment accordingly.